UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:20-cr-00101 |
| ) | |
| ABIGAIL H. QUESNEL, ) | |
| ) | |
| Defendant. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the preponderance of the evidence, the court makes the following findings of fact:

1. On November 2, 2021, after pleading guilty to Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, Cocaine Base, and 100 Grams or more of Heroin, Defendant Abigail H. Quesnel was sentenced to time served followed by a four-year term of supervised release. Defendant commenced her term of supervised release on that same day.

2. Defendant's conditions of supervised release included the following:

   Mandatory Condition (3): You must refrain from any unlawful use of a controlled substance.

   Special Condition: You must participate in substance abuse treatment, which may include a substance abuse assessment with a licensed substance abuse provider, and abide by any programmatic treatment recommendations. This program may include testing to determine whether you have reverted to the use of drugs or alcohol. You shall contribute to the cost of services rendered based on ability to pay or the availability of third-party payment. You must refrain from the use of alcohol and other intoxicants during and after treatment.

3. The United States Probation Office ("USPO") for the District of Vermont contracts with certain third-party vendors to provide testing for use of controlled substances. USPO's designated third-party vendors are required to follow certain protocols so that evidentiary samples can be tested by independent laboratories. These protocols include a requirement that all urine samples be observed and a requirement that a defendant sign for each sample provided.

4. During Defendant's term of supervised release, USPO had a third-party contract with Rutland Mental Health Services ("RMHS") to perform evidentiary drug testing for USPO. Except for a period during the COVID-19 pandemic, USPO did not have a contract with Dominion Diagnostics ("Dominion"). Dominion was thus unable to produce a drug testing sample that could be used for evidentiary purposes.

5. Pursuant to USPO's protocol, each time Defendant was required to undergo drug testing, she received a telephone call on a random basis directing her to report to RMHS for drug testing during a designated window of time.

6. On April 18, 2022, April 28, 2022, and May 5, 2022, USPO directed Defendant to appear for drug testing at RMHS. Defendant failed to do so.

7. On April 18, 2022 and May 26, 2022, Defendant submitted to drug testing at Dominion and claims on each occasion that she was given permission to do so by her U.S. Probation Officer. Defendant proffered no evidence of this alleged permission.

8. On April 18, 2022, Defendant provided a urine sample to Dominion that was presumptively positive for buprenorphine. On May 26, 2022, Defendant provided a urine sample to Dominion that was presumptively positive for buprenorphine, amphetamines, and opiates. These samples were not sent for confirmation testing.

9. When U.S. Probation Officer Mary Seller questioned Defendant about the positive preliminary test results at Dominion, Defendant denied using controlled substances and advised that she believed the positive buprenorphine result was caused by her partner sweating on her. Officer Seller instructed Defendant that all drug testing must take place at RMHS.

10. On June 27, 2022, a Petition on Probation and Supervised Release (the "Initial Petition") was filed with the court alleging that Defendant failed to appear for drug testing on April 18, 2022, April 28, 2022, and May 5, 2022. Defendant denied the allegations in the Initial Petition and was allowed to continue to reside in the community on conditions of release. A revocation hearing was set for October 6, 2022. It was continued pursuant to Defendant's unopposed motion. Thereafter, the issue became whether Defendant was using or continuing to use controlled substances while a revocation petition was pending.

11. USPO requires RMHS to fill out a chain of custody form for each drug testing specimen produced by a defendant. This chain of custody form tracks the bar code and specimen ID number assigned to the sample.

12. USPO typically directs RMHS to send drug testing samples to a regional drug laboratory in Missouri which conducts a screening test and then sends samples that have preliminarily indicated a positive test result to Alere Toxicology Services ("Alere") for confirmation testing. A transfer certification on the chain of custody

form tracks this transfer. If the court needs a quicker result, USPO can send the specimen directly to Alere. In either case, Alere conducts the testing and returns the chain of custody form to USPO with the associated test results. USPO then confirms, among other things, that the defendant's name, test results, and specimen number on the chain of custody form and test results match and correspond to the defendant who provided the sample.

13. David E. Golz, a Technical Manager, SAMHSA Responsible Person, and forensic toxicologist employed by Alere, credibly testified as an expert witness to Alere's stringent independent drug testing protocols. These protocols are consistent with peer-reviewed standards adopted by the scientific community to ensure drug testing reliability. Each specimen sent to Alere is subject to quality control procedures by a certifying scientist. The chain of custody is also reviewed. If there is any evidence of tampering or a mismatch in the specimen identification, drug testing does not proceed. Mr. Golz credibly testified that the peer-reviewed methods Alere employs yield accurate and reliable drug testing results. The court so finds.

14. Specimens are received into Alere's laboratory in a secure Accessioning Area by U.S. mail, UPS, FedEx, or courier. The specimen bags are opened by the laboratory personnel and bottle seals are examined for integrity. The chain of custody form is examined for completeness and both it and the specimen bottle must contain identical specimen ID numbers in print and in barcode. The association between the specimen bottle and the chain of custody form is confirmed by scanning the specimen ID barcode on the bottle and the chain of custody form. Alere's laboratory information system generates a unique lab accession number and labels which are applied to the specimen bottle and the chain of custody form.

15. "Aliquoting" is a process by which a portion of urine from the original specimen bottle is removed for analysis by the laboratory. Alere processes one specimen bottle at a time to ensure specimen integrity. All aliquot test-tubes are affixed with barcode labels that match the lab number on the specimen bottles. The completed batches of initial test aliquots are transferred to the main laboratory with an Aliquot Chain of Custody form for initial screening. All transfers of the aliquots during the screening procedures are documented on the Aliquot Chain of Custody form. The specimen in the original specimen bottle is transferred to temporary storage and this transfer is documented as well.

16. Alere screens specimen aliquots on a Beckman Coulter AU5400 or AU5800 analyzer using BIA and CEDIA immunoassay reagents. Calibration of the instrument is performed prior to analysis of quality controls and donor specimens. A set of quality controls is run at the beginning and end of each batch. In addition to selected

drugs/metabolites that are commonly the subject of substance abuse, Creatinine, Specific Gravity, oxidants, and pH tests are generally performed on specimens.

17. If a presumptive positive result is indicated by the initial screen, Alere employs a second analytical test by Gas Chromatography/Mass Spectrometry (GC/MS) or Liquid Chromatography/tandem Mass Spectrometry (LCMSMS) which are used to confirm the initial screening result. These are evidentiary testing methods that are generally accepted in the scientific community. A valid analysis also provides the concentration of the drug/metabolite in the specimen. The same aliquots used for these analyses are re-poured from the original specimen bottles which ensure the authenticity of the initial screening result using an independent analysis. All transfers for this evidentiary testing are documented. The GC/MS analysis is performed on Agilent GC/MS analyzer in the Selective Ion Monitoring mode. The LCMSMS analysis is performed using an ABSciex tandem Mass Spectrometer in MRM Mode.

18. In this case, three confirmed drug testing results introduced into evidence correspond to chain of custody forms that identify Defendant by last name and which contain a unique bar code as well as specimen number. The chain of custody form records the date the sample was collected, includes the Case Officer's initials, sets forth a PACTS No. and Onsite/Test ID, and includes an account number. USPO's name and address is included on the chain of custody form as is Alere's. Each chain of custody form at issue in this case records the reason for the specimen as "Urine Surveillance." Defendant was required to sign for each sample provided.

19. On October 26, 2022, Defendant reported to RMHS and provided a urine sample for drug testing which was assigned specimen number B04753249 on the sample and the chain of custody form. Although the individual who took evidentiary sample B04753249 at RMHS indicated it was for "Urine Surveillance," the individual did not sign the "Specimen Collector Certification," which provides:

    I certify I collected the specimen identified by the specimen number on this
    form in accordance with the required collection procedures. I certify I
    applied the numbered security seal and barcode on the specimen bottle in
    the offender/defendant's presence. I have verified that the specimen number
    on the form, the barcode, and the specimen seal are identical.

20. The chain of custody form for specimen number B04753249 includes a signed "Specimen Transfer Certification" which states as follows:

    I certify I prepared for transfer in Testing Laboratory the specimen
    identified by the specimen number on this form and have verified the
    identity of the specimen with its collection chain of custody documentation.
    I certify I applied the numbered security seal and barcode on the specimen

4

bottle. I have verified the specimen number on the form, the barcode, and specimen security seal are identical.

This certification is completed by the regional laboratory before the sample is sent to Alere.

21. Alere conducted independent drug testing for specimen number B04753249 and reported to USPO that the specimen confirmed positive for fentanyl/norfentanyl.

22. When U.S. Probation Officer Justin Farris confronted Defendant with the confirmed positive fentanyl test result for specimen B04753249, Defendant stated she believed her positive test was caused by cleaning up an unknown substance in her stepson's room.

23. On November 17, 2022, an Amended Petition on Probation and Supervised Release (the "Amended Petition") was filed with the court and included, in addition to Defendant's alleged failure to report for drug testing, an allegation that Defendant had unlawfully used a controlled substance on or about October 26, 2022 that was confirmed positive for fentanyl.

24. On December 19, 2022, Defendant admitted to failing to appear for drug testing (she has since withdrawn this admission) but denied use of a controlled substance.

25. On or about February 7, 2023, USPO directed Defendant to report for drug testing at RMHS and Defendant provided urine sample specimen B05047438 which she was required to sign for. The Specimen Collector Certification was not signed. Specimen B05047438 was tested by Alere and confirmed positive for cocaine, the cocaine metabolite, and amphetamine/methamphetamine. Defendant was taking Adderall at the time. The chain of custody form includes a signed Specimen Transfer Certification.

26. On February 24, 2023, Officer Farris met with Defendant to discuss the confirmed positive drug test result for cocaine from the sample provided on February 7, 2023. Defendant denied any use of controlled substances other than Adderall and stated she had been cleaning rooms in her house and must have touched old drug residue which was absorbed through her skin.

27. On March 6, 2023, a Second Amended Petition on Probation and Supervised Release (the "Second Amended Petition") was filed with the court, alleging the same drug testing violations as the Initial Petition as well as the confirmed positive tests for fentanyl on or about October 26, 2022 and for cocaine on or about February 7, 2023.

28. Defendant denied the allegations in the Second Amended Petition. An initial appearance and final revocation hearing were set for April 4, 2023. Prior to the hearing, Defendant's attorney filed a motion to withdraw. Also prior to the April 4,

2023 hearing, at USPO's office, Defendant submitted an observed urine sample, identified as specimen B000009874, which tested presumptively positive for cocaine which was later confirmed positive by Alere for both cocaine and the cocaine metabolite. Officer Seller signed the Specimen Collector Certification. When confronted with the positive confirmed test result for cocaine, Defendant denied any illicit drug use and claimed the prescription eye drops she was taking to treat an eye condition were responsible for the positive cocaine result. She has also suggested that dental procedures she recently underwent may be responsible.

29. The court granted Defendant's counsel's motion to withdraw and appointed new counsel. It continued the revocation hearing so that Defendant's new counsel could prepare for a merits hearing. The court did not detain Defendant at this time because she had an eye appointment scheduled which she needed to attend.

30. On or about April 10, 2023, a Third Amended Petition on Probation and Supervised Release (the "Third Amended Petition") was filed which alleged the same violations as the Second Amended Petition and which added the confirmed positive cocaine result for Defendant's urine sample provided on April 4, 2023.

31. On April 13, 2023, Defendant appeared before the court and submitted a urine sample which was presumptively negative. At the time, Defendant was still undergoing treatment for her eye condition. Defendant denied the allegations in the Third Amended Petition and was detained pending a revocation hearing on July 7, 2023.

32. As part of Mr. Golz's testimony, he adopted the results contained in "litigation packets" admitted as Government's Exhibits 10-12, which contain confirmed positive test results for specimens B04753249, B05047438, and B000009874. In each case, he opined that the test results indicate the consumption of illicit substances by the person who submitted the urine sample. With the exception of Defendant's use of Adderall causing the positive result for amphetamine/methamphetamine, he opined that none of the remaining test results can be explained by Defendant's use of prescribed medications. In addition, although a dental procedure using TAC could potentially result in a positive urinary drug test for cocaine if it were administered shortly before the urine collection, he opined that in light of the time period that elapsed between Defendant's dental procedure and the urine collection, TAC would not account for a positive urine drug test for cocaine. Mr. Golz further credibly opined that none of the environmental reasons Defendant offered for her positive test results would trigger confirmed positive results. The court so finds.

33. Mr. Golz acknowledged he has no personal knowledge regarding whether the urine samples in question were taken in conformity with acceptable drug testing protocols.

34. Alere does not have a Missouri facility, and Mr. Golz has no knowledge of any Missouri facility involved in this case.

## CONCLUSIONS OF LAW AND ANALYSIS

Both parties filed supplemental briefing after the court's hearing. Defendant challenges RMHS's collection protocols for two confirmed positive drug specimens, noting that specimens B04753249 and B05047438 do not have a signed Specimen Collector Certification or testimony from the persons who took the specimens. Although not ideal, the absence of this evidence including a Specimen Collector Certification is not fatal to the reliability of these specimens and the testing results derived therefrom.

Considering the totality of the evidence, it remains more likely than not that Defendant, after being directed by USPO to RMHS for urine testing at designated dates and times, provided a urine sample on those dates and times. RMHS, which had previously reported to USPO Defendant's nonappearance on April 18, 2022, April 28, 2022, and May 5, 2022, did not report Defendant's failure to report on any subsequent occasion. When confronted by her U.S. Probation Officer with positive confirmed test results for urine samples taken on October 26, 2022 and February 7, 2023, Defendant did not claim she did not produce the urine samples involved. Rather, she denied use of controlled substances and claimed her positive test results may have been caused by environmental contact with unknown substances. The government has thus established by a preponderance of the evidence that it was Defendant, and not someone else, who submitted to drug testing at RMHS on the dates specimens B04753249 and B05047438 were taken.

The government has further established by a preponderance that RMHS conducted visual surveillance of specimens B04753249 and B05047438 when Defendant provided them. Not only do the chain of custody forms for specimens B04753249 and B05047438 identify "Urine Surveillance" as the type of sample taken, USPO's protocol requires RMHS to conduct urine sampling for evidentiary purposes in this manner. Defendant's name accompanies both specimens B04753249 and B05047438 and protocol required that she signed for each of them. The Case Officer involved identified themselves by their initials.

Alternative explanations for specimens B04753249 and B05047438 are wholly implausible. Defendant had no incentive to submit urine samples to RMHS belonging to someone else that were positive for controlled substances, nor does she claim to have done so. Likewise, RMHS had no incentive to submit false samples on Defendant's behalf or submit Defendant's urine samples with incorrect specimen numbers. Defendant's urine sample tested positive for the Adderall which she was taking at the time. It would be highly and improbably coincidental that a false sample would nonetheless reflect a medication Defendant was taking at the time. Even without certification of compliance with testing protocols, the government has established by a preponderance of the evidence that Defendant provided specimens B04753249 and B05047438 in a visually observed drug testing on the dates indicated.

In addition, Defendant provided an observed urine sample on April 4, 2023 to Officer Seller, specimen B000009874, which confirmed positive for cocaine and the cocaine metabolite. This specimen was accompanied by a Specimen Collector Certification which recorded Officer Seller's compliance with required collection procedures. Defendant initially did not identify any deficiencies in the collection methods that produced this specimen, however, in her post-trial briefing she claims the government should have called Officer Seller to testify. Officer Seller's certification attests to her compliance with testing protocols. Again, it is highly implausible that it was not Defendant's urine sample that was tested in light of the testing protocols in place. The government's failure to call Officer Seller as a witness does not render the test result invalid. *See United States v. Hon*, 904 F.2d 803, 810 (2d Cir. 1990) ("The prosecution is not required to exclude all possibility that the article may have been tampered with.") (internal quotation marks omitted).

Defendant's challenge to the chain of custody for the three specimens is equally unavailing. A defect "in the chain of custody do[es] not bear upon the admissibility of evidence, only the weight of the evidence[.]" *United States v. Jackson*, 345 F.3d 59, 65 (2d Cir. 2003). Under Fed. R. Evid. 901(b)(3), it suffices if the specimen is "authenticated" meaning there is sufficient evidence to support a finding that it is

genuine. *United States v. Mangan*, 575 F.2d 32, 42 (2d Cir. 1978). This determination may be made by the trier of fact, including a jury, even in the absence of expert witness testimony. *United States v. Alvarez-Farfan*, 338 F.3d 1043, 1045 (9th Cir. 2003).

Here, there is ample evidence to support the court's conclusion that specimens B04753249, B05047438, and B000009874 were produced by Defendant, are genuine, and were sent at USPO's direction to Alere for drug testing. The presence of an intermediary drug laboratory in Missouri that facilitated the transfer in two instances does not alter that conclusion in light of the transfer certifications for each sample sent there. Alere's litigation package for each specimen contains a photograph of the sample, and documents the stringent controls imposed to ensure the specimen submitted corresponds to the confirmed test results which Alere provided to USPO. There is no unexplained break in the chain of custody. Adequate measures were taken at each step to ensure that specimens B04753249, B05047438, and B000009874 and the corresponding test results are what they purport to be. Even when "the chain of custody proof [is] not airtight and the government's case ultimately rest[s] on inferences," a rational factfinder can find the challenged evidence reliable. *See United States v. Grant*, 967 F.2d 81, 84 (2d Cir. 1992). The court does so in the instant case.

Based on the foregoing, the government has established by a preponderance of the evidence that Defendant tested positive for controlled substances on at least three occasions during her supervised release (fentanyl/specimen B04753240, cocaine/specimen B05047438, and cocaine/specimen B000009874). It has further established that Defendant's prescription medications, dental procedures, and environmental factors did not produce these positive test results. Instead, the only credible explanation for the test results is that Defendant intentionally ingested controlled substances during her supervised release on at least three occasions while a revocation petition was pending and was repeatedly dishonest with USPO about doing so.

Finally, the government has established by a preponderance of the evidence that Defendant failed to report to RMHS for drug testing on April 18, 2022, April 28, 2022, and May 5, 2022 and that she was not granted permission to report to Dominion instead.

Although Dominion's preliminary tests indicated Defendant may have used controlled substances on two additional occasions, its test results cannot be used by USPO for evidentiary purposes. There would thus be no reason for USPO to repeatedly grant Defendant permission to undergo drug testing at Dominion.

For the reasons stated above, the court concludes that Defendant Quesnel violated Mandatory Condition 3 and the Special Condition of her conditions of supervised release as alleged in the Third Amended Petition. This matter shall be set for sentencing.
SO ORDERED.

Dated at Burlington, in the District of Vermont, this 14th day of July, 2023.

_____
Christina Reiss, District Judge
United States District Court